IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES COSTA and RICHARD ALVARADO, | ) | |
| | ) | Case No. 03 C 8223 |
| Plaintiffs, | ) | |
| | ) | Judge Mark Filip |
| v. | ) | |
| | ) | |
| MAURO CHEVROLET, INC., | ) | |
| JASON LARSON (finance manager), | ) | |
| JOSEPH BOSCO (general manager), and | ) | |
| GENERAL MOTORS ACCEPTANCE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs James Costa and Richard Alvarado (collectively, "Plaintiffs") filed suit against

defendants Mauro Chevrolet, Inc., Jason Larson, Joseph Bosco and General Motors Acceptance

Corporation (collectively, "Defendants"). Plaintiffs' amended complaint (the "Amended

Complaint") variously alleges violations of the Credit Repair Organizations Act (Count I), the

Equal Credit Opportunity Act (Count II), the Fair Credit Reporting Act (Count III), the Illinois

Consumer Fraud Act (Count IV), and Article 9 of the Illinois Commercial Code (Count VI).

(D.E. 27.) The Amended Complaint also alleges common law fraud in the inducement (Count

V), and conversion (Count VII). (*Id.*)[1]

---

[1]     Defendants filed separate motions to dismiss Plaintiffs' initial complaint (the
"Initial Complaint"). (D.E. 1, 2 and 3.) On or about July 26, 2004, the Court granted
Defendants' motions to dismiss the Initial Complaint without prejudice to Plaintiffs' ability to
replead "so that [Plaintiffs] may plead the circumstances of fraud with somewhat more
particularity (not much more is needed) as to Counts I, IV and V, and can clarify their adverse
action allegations as to Counts II and III." (D.E. 25.) The other two counts (VI and VII) were
not addressed by Defendants' motions to dismiss the Initial Complaint.

Mauro Chevrolet, Inc. ("Mauro Chevrolet") is named as a defendant in Counts I through V. Jason Larson ("Larson") and Joseph Bosco ("Bosco") are named as defendants as to Counts II, III, IV, and V. General Motors Acceptance Corporation ("GMAC") is named as a defendant as to Counts IV, VI, and VII.

Defendant Mauro Chevrolet moved to dismiss Counts I through V. (D.E. 29.) Defendants Larson and Bosco moved to dismiss Counts II through IV. (D.E. 30.) Defendant GMAC moved to dismiss Counts IV, VI and VII. (D.E. 28.) For the reasons stated below, the Court denies the motions to dismiss.

## I.    Factual Background[2]

In May 2002, Plaintiff Richard Alvarado ("Alvarado") went with his girlfriend to Mauro Chevrolet in order to purchase a car. (D.E. 27 ¶ 6.) "Michael"—a salesman at the car dealership—checked the credit history of Alvarado and his girlfriend, and then informed them that Mauro Chevrolet would not arrange a car loan for them because Alvarado had no credit history, and Alvarado's girlfriend was unemployed. (*Id.* ¶ 7.) Apparently, neither Michael, nor the two managers on duty at the dealership (Defendants Larson and Bosco), submitted Alvarado's credit application to a financing source. (*Id.*) Instead, Michael asked Alvarado if he knew anyone willing to co-sign a car loan for him. (*Id.* ¶ 8.) Alvarado told Michael that either his girlfriend's mother or perhaps his friend, Plaintiff James Costa ("Costa"), could co-sign the loan. (*Id.* ¶ 9.)

---

[2]      The following facts are taken from the Amended Complaint. The Court accepts the allegations as true, as precedent instructs, for present purposes. The Court takes no position concerning whether any of the allegations are actually well-founded.

Approximately one week later, Alvarado returned to Mauro Chevrolet with Costa. (*Id.* ¶ 11.) After checking Alvarado's and Costa's respective credit reports, Michael told them that Mauro Chevrolet would arrange a car loan for Costa, but not for Alvarado, and suggested that Costa purchase the car in his name only. (*Id.* ¶¶ 12-13.) Alvarado and Costa told Michael that this was unacceptable because one of the purposes of purchasing the car was to establish Alvarado's credit history. (*Id.* ¶ 14.)[3] Michael reiterated that Mauro Chevrolet could not arrange for a car loan in Alvarado's name. (*Id.* ¶ 15.) Alvarado and Costa told Michael that they would not consent to any financing in which Alvarado was not listed as the purchaser. (*Id.* ¶ 16.)

As Alvarado and Costa were leaving the car dealership, Michael stopped them and said that he would see what his manager could do for them. (*Id.* ¶ 17.) Thereafter, Defendant Bosco, the general manager, came to meet with Alvarado and Costa. (*Id.* ¶ 18.) Bosco told Alvarado and Costa the same thing that Michael told them, namely that Mauro Chevrolet could not approve a loan for Alvarado based on his lack of credit history, but could approve a car loan in Costa's name. (*Id.*) Alvarado and Costa refused Bosco's offer, again stating that the car loan needed to be in Alvarado's name to establish his credit history. (*Id.* ¶ 19.) They also told Bosco that Costa would co-sign a loan for Alvarado only if the subsequent paperwork, title, and payments were in Alvarado's name. (*Id.*) Bosco responded that Mauro Chevrolet would approve a car loan with Alvarado as the purchaser, and Costa as the co-signor, if Alvarado and Costa each submitted paycheck stubs from their respective jobs. (*Id.* ¶ 20.) At Alvarado's request, Bosco agreed that they could bring the paycheck stubs to the car dealership at a later date. (*Id.* ¶ 21.)

---

[3]     Michael, Larson, and Bosco allegedly again failed to submit Alvarado's credit application to any bank or finance company. (*Id.* )

Bosco then indicated that he approved the deal with Alvarado listed as the buyer and Costa listed as the co-signor. (*Id.*)

After Alvarado selected a car, a 2002 Chevrolet Cavalier, Alvarado and Costa met with Larson, the finance manager at Mauro Chevrolet. (*Id.* ¶ 22-23.) They asked Larson if the arrangement with Bosco with respect to the car loan would help establish Alvarado's credit history. (*Id.* ¶ 24.) Larson confirmed that having Alvarado listed as the buyer, and Costa listed as the co-signor, would help establish Alvarado's credit history. (*Id.* ¶ 25.) Alvarado and Costa then signed the car loan documents, and Alvarado provided a down payment in the amount of $1,400.00. (*Id.* ¶ 28.)

Once the documents were signed, Costa left. (*Id.* ¶ 29.) Alvarado stayed at the dealership while the car was cleaned and prepared for delivery. (*Id.* ¶ 30.) When Larson gave the car keys to Alvarado, he did not give Alvarado a copy of the retail installment contract or other documents associated with the sale. (*Id.* ¶ 31.)

Approximately one month later, Alvarado noticed that he had not received a monthly car loan payment booklet in the mail, and he went to Mauro Chevrolet to inquire about the booklet. (*Id.* ¶¶ 33-34.) At the dealership, Alvarado met with Larson, who told him that this occurs all the time, and that he could make payments directly at the car dealership until he received the payment booklet in the mail. (*Id.* ¶ 34.) Larson then directed Alvarado to an on-site cashier to make the first car loan payment. (*Id.* ¶ 35.)

Alvarado returned to the car dealership one month later and told Larson that he still had not received the payment booklet. (*Id.* ¶ 36.) Larson replied: "It's ok, this happens and I'll call GMAC and ask them about it." (*Id.* ¶ 36.) Alvarado made his second car loan payment while he

4

was at the dealership. (*Id.* ¶ 37.) Approximately two weeks later, Alvarado called Larson and told him that he still had not received the payment booklet. (*Id.* ¶ 38.) Larson responded, "This is weird, this is not supposed to happen. I already called GMAC and they said they sent it out." (*Id.*)

Alvarado later returned to the dealership to make his third car loan payment. (*Id.* ¶ 39.) While there, he again asked Larson about the missing payment booklet. (*Id.*) In response, Larson asked Alvarado whether Costa received the payment booklet. (*Id.* ¶ 40.) Alvarado told him that Costa had not received the payment booklet. (*Id.* ¶ 41.)

A month later, Alvarado called Larson again about the missing payment booklet. (*Id.* ¶ 42.) Alvarado also told Larson that Costa had not received a payment booklet. (*Id..*) This time, Larson told him to wait another month and that it was "GMAC's fault that they haven't sent the booklet." (*Id.* ¶ 45.) The next month, when Alvarado called Larson about the missing payment booklet, Larson told him to wait for the booklet and make the two payments due with respect to the car loan at once. (*Id.* ¶ 46.) After another month passed, and Alvarado still had not received the payment booklet, Alvarado called Larson and made the two payments due over the telephone. (*Id.* ¶¶ 47-48.)

On or about November 18, 2002, Alvarado noticed that the car was missing. (*Id.* ¶ 49.) After checking with his mother and his girlfriend to determine whether either of them moved the car, he went to the police station to report the car missing. (*Id.* ¶¶ 49-51.) At the police's suggestion, Alvarado called "311" to find out whether his car had been towed. (*Id.* ¶ 52.) A "311" operator informed him that the car had been repossessed (*Id.* ¶ 53.) Alvarado then called Mauro Chevrolet to find out why the car had been repossessed. (*Id.* ¶54.) Alvarado contacted

5

Larson, who said that he did not know why the car was repossessed. (*Id.* ¶ 54-55.) Alvarado then asked to speak with Bosco, who also said that he did know anything about the repossession. (*Id.* ¶ 56.)

A couple of days later, Alvarado called Larson. (*Id.* ¶ 57.) On the call, Larson informed Alvarado that, according to GMAC, Alvarado missed some car loan payments. (*Id.* ¶ 57.) Alvarado then contacted GMAC. (*Id.* ¶ 59.) GMAC told him that the car was repossessed due to his having failed to make several payments. (*Id.*) Alvarado informed GMAC that he could prove that he had not missed any car loan payments. (*Id.* ¶ 60.) When Alvarado asked GMAC about the payment booklet, he was told that GMAC did send the booklet to him. (*Id.* ¶ 61.)

Alvarado and Costa subsequently made several attempts to obtain a copy of the sales contract with respect to the car, but Bosco and Ted Hess, Mauro Chevrolet's sales manager, would not provide them with a copy of the contract. (*Id.* ¶ 62.) On July 13, 2003, a GMAC representative called Costa and told him that he had one month to start making payments with respect to the car loan, otherwise a collection agency would take over the account. (*Id.* ¶ 63.) Thereafter, Costa contacted GMAC and requested a copy of the sales contract. (*Id.* ¶ 64.) The GMAC representative replied, "I wouldn't waste my time pursuing the contract because then both you and [Alvarado] would be held accountable for the debt[.]" (*Id.* ¶ 65.) GMAC apparently refused to send Costa a copy of the contract. (*Id.* ¶ 66.)

## II.    Standard of Review

"A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint for failure to state a claim upon which relief may be granted." *Johnson v. Rivera*, 272 F.3d 519, 520-21 (7th Cir. 2001). In deciding a motion to dismiss, the court must assume all facts alleged

6

in the complaint to be true, construe the allegations generously and view the allegations in the light most favorable to plaintiffs. *See, e.g., Singer v. Pierce & Assoc., P.C.*, 383 F.3d 596, 597 (7th Cir. 2004); *Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000). Dismissal for failure to state a claim is appropriate where "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

A pleading merely must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In this regard, a party simply must provide the "defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993) (quoting *Conley*, 355 U.S. at 47). Fed. R. Civ. P. 9(b), which creates various exceptions to notice pleading, specifies that with respect to "averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *See* Fed. R. Civ. P. 9(b). As articulated by the Seventh Circuit, "this means the who, what, when, where, and how; the first paragraph of any newspaper story, must be evident in the complaint." *DiLeo v. Ernst & Young*, 901 F.3d 624, 627 (7th Cir. 1990).

## III.    Discussion

### A.    Count I: Violation of Credit Repair Organizations Act Against Mauro Chevrolet[4]

---

[4]     The heading with respect to Count I alleges a violation of the CROA only against Mauro Chevrolet. (D.E. 27 at 8.) Count I's prayer for relief, however, requests judgment not only against Mauro Chevrolet, but also against Larson and Bosco. (*Id.* at 8-9.) Mauro Chevrolet's motion to dismiss states that Count I alleges a violation of the CROA only against Mauro Chevrolet. (D.E. 29 at 3.) Plaintiffs do not dispute this characterization of Count I in

Count I alleges that Mauro Chevrolet engaged in fraudulent practices in violation of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679b. (D.E. 27 ¶ 71.) Mauro Chevrolet contends that Count I should be dismissed because (i) Mauro Chevrolet is not a credit repair organization which offers to improve the credit standing of consumers; (ii) Mauro Chevrolet did not receive "the payment of money or other valuable consideration"; (iii) there are no allegations that Mauro Chevrolet misrepresented the services of a credit repair organization; and (iv) Alvarado was told twice that his credit history was insufficient with respect to financing a car. (D.E. 29 at 3-4.) Accordingly, in the movants' view, Count I should be dismissed. The Court respectfully disagrees.

Section 1679a(3)(A) of the CROA defines "credit repair organization" as an organization that (i) used any instrumentality of interstate commerce or the mails, in order to (ii) sell, provide, or perform (or represent that it could do so); (iii) in return for valuable consideration; (iv) services or advice about services designed to improve a consumer's credit record, credit history, or credit rating. 15 U.S.C. § 1679a(3)(A). Mauro Chevrolet contends that it does not fall within this definition of a credit repair organization, and it therefore cannot be liable under any provision of the CROA.

This contention has been rejected numerous times in caselaw in this district, including by this Court in its prior order (D.E. 25) granting Defendants' initial motions to dismiss this case. *See, e.g., Rodriguez v. Lynch Ford, Inc.*, No. 03 C 7727, 2004 WL 2958772, *5 (N.D. Ill. Nov. 18, 2004); *Parker v. 1-800 Bar None*, No. 01-4488, 2002 WL 215530, *5 (N.D. Ill. Feb. 12,

their response to the motion to dismiss. (D.E. 35.) Based on Count I's heading, as well as Plaintiffs' failure to dispute the issue, the Court treats Count I as requesting relief only against Mauro Chevrolet, at least for present purposes.

8

2002); *Bigalke v. Creditrust Corp.*, 162 F. Supp. 2d 996, 999 (N.D. Ill. 2001); *Vance v. Nat'l Benefit Ass'n*, No. 99 C 2627, 1999 WL 731764, *4 (N.D. Ill. Aug. 26, 1999). Caselaw in this district teaches that, even where a plaintiff cannot prove that the defendant is a credit repair organization within the meaning of section 1679a(3)(A) of the CROA, the plaintiff potentially "can nevertheless state a claim . . . under section 1679b of the CROA." *Parker*, 2002 WL 21553 at *5.

Section 1679b provides that it is a violation of the CROA for any "person" to "make any statement, or counsel or advise any consumer to make any statement, the intended effect of which is to alter the consumer's identification to prevent the display of the consumer's credit record, history, or rating for the purpose of concealing adverse information that is accurate and not obsolete . . . ." 15 U.S.C. § 1679b(a)(2)(B)(ii). Normally, when Congress uses different terms in this manner in the same statute, Congress's choice to employ different terms (at least in the absence of contrary evidence) means that the two terms have different meanings. *See generally Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 975 (7th Cir. 2004) (analysis of CROA questions "must begin with the language of the statute itself.") (citation omitted). The term "person" in the law certainly encompasses a broader universe of individuals and entities than the term "credit repair organization" employed and defined in Section 1679a. *Accord, e.g., Bigalke*, 162 F. Supp.2d at 999 (holding that even if defendant is not a credit repair organization within the meaning of section 1679a(3)(A), section 1679b applies to the defendant). Defendants point to nothing in the text or legislative history of the CROA to suggest that "person" should not be afforded its ordinary and broader meaning than "credit repair organization." Accordingly, the

9

Court finds that, to sustain a claim under the plain language of section 1679b of the CROA, Plaintiffs need not allege that Mauro Chevrolet is a "credit repair organization."[5]

Mauro Chevrolet also contends that Count I should be dismissed because Plaintiffs failed to allege fraud or misrepresentation with the particularity required by Federal Rule of Civil Procedure 9(b). The Court respectfully disagrees. In the prior order dismissing the Initial Complaint, the Court stated that "not much more is needed" to satisfy the particularity requirement with respect to Count I and specified that, to survive a motion to dismiss, Count I would need to allege that Mauro Chevrolet falsely represented to GMAC that Costa was the actual purchaser of the vehicle. (D.E. 25.) Count I, as amended, specifically alleges Mauro Chevrolet falsely represented to GMAC that Costa was the purchaser of the vehicle and hid from GMAC the true purchaser, Alvarado, by "writing the deal up in Costa's name only." (D.E. 27 ¶ 69.) Count I also alleges that Mauro Chevrolet fraudulently induced Costa to sign documents reflecting that he was the purchaser under the false representation that he was merely serving as co-signor. (*Id.* ¶¶ 19-28, 70.) There is no meaningful ambiguity about when or where these alleged misrepresentations occurred. Based on these allegations, as well as the other allegations incorporated into Count I, the Court finds that Count I meets Rule 9(b)'s heightened pleading requirements.

---

[5]     Mauro Chevrolet's other arguments—that it did not receive consideration, that Count I fails to allege it misrepresented credit repair services, and that Alvarado was told that his credit history was insufficient—are unavailing. These arguments relate to the elements of a section 1679a claim; they do not pertain to a claim arising under section 1679b of the CROA.

Reading the allegations in the light most favorable to Plaintiffs, as the Court must do, the Court concludes that Count I sufficiently states a claim under section 1679b of the CROA. Accordingly, the Court denies the motion to dismiss Count I.

**B.      Count II: Violation of Equal Credit Opportunity Act Against Mauro Chevrolet, Larson, and Bosco**

Count II alleges that Defendants Mauro Chevrolet, Larson and Bosco violated the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*, when they failed to timely notify Alvarado in writing that Mauro Chevrolet "denied credit to Mr. Alvarado," in that they "declined to submit Alvarado's credit application to any financing source." (D.E. 27 ¶¶ 76-77.) Defendants contend that Count II fails to state a claim under the ECOA because it does not allege any discrimination. (D.E. 29 at 6; D.E. 30 ¶ 11.) The Court respectfully disagrees.

Under the ECOA, a credit applicant who receives an adverse action on a credit decision is entitled to a written notice of a denial of credit and, if desired, a written statement of the reasons for such action. *See* 15 U.S.C. § 1691(d)(2). Without regard to allegations of discrimination, a creditor's failure to provide a written rejection notice is actionable under the ECOA. *See, e.g., Rayburn v. Car Credit Center Corp.*, No. 00 C 3361, 2000 U.S. Dist. LEXIS 14944, *7-8 (N.D. Ill. Oct. 6, 2000) (holding that although the ECOA addresses discriminatory lending practices, among other things, discrimination is not a prerequisite to every actionable ECOA claim); *Williams v. Thomas Pontiac-GMC-Nissan-Hyundai*, No. 99 C 882, 1999 WL 787488, *3 (N.D. Ill. Sept. 24, 1999) (holding that allegation of creditor's failure to provide a written rejection notice, notwithstanding the absence of any charges of discrimination against plaintiff, is sufficient to state an ECOA claim); *Pinkett v. Payday Today Loans, LLC*, No. 99 C 3332, 1999

11

WL 592189, *1 (N.D. Ill. Aug. 3, 1999) (observing that the plain language of the statute does not require allegations of discrimination).[6]

Seventh Circuit precedent teaches that the "strict notice requirement" of the ECOA is a "strong and necessary adjunct to the antidiscrimination purpose of the legislation, for only if creditors know they must explain their decisions will they effectively be discouraged from discriminatory practices." *Treadway*, 362 F.3d at 977. The Seventh Circuit further clarified that the ECOA's notice requirement achieves a broader purpose, stating that:

> rejected credit applicants will now be able to learn where and how their credit status is deficient and this information should have a pervasive and valuable educational benefit. Instead of being told only that they do not meet a particular creditor's standards, consumers particularly should benefit from knowing, for example, that the reason for the denial is their short residence in the area, or their recent change of employment, or their already over-extended financial situation. In those cases where the creditor may have acted on misinformation or inadequate information, the statement of reasons gives the applicant a chance to rectify the mistake.

*Id.* at 977 (quoting *Fischl v. Gen. Motors Acceptance Corp.*, 708 F.2d 143, 146 (5th Cir. 1983) (in turn quoting 147 S.Rep. No. 94-589, 94th Cong., 2d Sess., reprinted in 1976 U.S. Code Cong. & Admin. News, pp. 403, 406)).

Because section 1691(d) of the ECOA sets forth a notification requirement separate and apart from the statute's anti-discrimination provisions, the Court finds that Alvarado's allegation that Mauro Chevrolet failed to provide written notification of an adverse credit decision is

---

[6]     In their motion to dismiss, Larson and Bosco also contend that Count II should be dismissed because Alvarado admits that he was told that his credit was unacceptable and that the car would not be sold to him. (D.E. 30 at 11.) This contention is without merit. As stated above, the ECOA requires written notice of an adverse credit action, and while notice (or aspects of it) may be provided orally under certain circumstances (*see* 15 U.S.C. § 1691(d)(2)(B)), the allegations in the Amended Complaint do not logically require the conclusion that such circumstances apply in this case. As a result, dismissal is inappropriate.

sufficient to establish an ECOA claim. *See, e.g., Treadway*, 362 F.3d at 977; *Rayburn*, 2000

U.S. Dist. LEXIS 14944 at * 9; *Pinkett*, 1999 WL 592189 at *1 (citing *Jochum v. Pico Credit*

*Corp. of Westbank*, 730 F.3d 1041, 1043 (5th Cir. 1984)).[7] Accordingly, the Court denies the

motions to dismiss Count II.

### C. Count III: Violation of Fair Credit Reporting Act Against Mauro Chevrolet, Larson, and Bosco

Count III alleges that Defendants Mauro Chevrolet, Larson and Bosco failed to notify

Alvarado that Mauro Chevrolet declined to submit Alvarado's credit application to a bank or

other lender in violation of section 1681m of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C.

§ 1681 *et seq.* (D.E. 27 ¶¶ 80-81.) Defendants contend that Count III should be dismissed

because, in the Amended Complaint, Alvarado admits that Mauro Chevrolet told him on two

occasions that his credit was unacceptable. (D.E. 29 at 7.) Defendants also contend that Count

III should be dismissed because Plaintiffs fail to allege that Alvarado was denied financing based

---

[7]     As mentioned above, the ECOA notice requirement only applies to an "adverse action" taken by a "creditor." 15 U.S.C. § 1691a(e). None of the Defendants dispute that Mauro Chevrolet is a "creditor," or that its failure to submit a credit application constitutes an "adverse action," for purposes of the ECOA. In this regard, in *Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971 (7th Cir. 2004), the Seventh Circuit held that a car dealership that arranges car loans could constitute a "creditor" for purposes of the ECOA. *See id.*, 362 F.3d at 980 ("[T]here is 'a continuum of participation in a credit decision from no participation, to referring applicants to the decision maker, to final decision making. At some point along the continuum, a party becomes a creditor for purposes of the notification requirements of the [ECOA].'") (quoting *Bayard v. Behlmann Auto. Servs., Inc.*, 292 F.Supp.2d 1181, 1186 (E.D.Mo. 2003)). *Treadway* held that the unilateral decision of a car dealership not to submit a credit application to any lender constitutes an "adverse action" and is actionable under the ECOA's notice provision. *Id.* at 975-76; *see also Mangia v. Tony Rizza Oldsmobile, Inc.*, No. 01 C 460, 2002 WL 554504, *1 (N.D. Ill. Apr. 15, 2002) (collecting cases regarding circumstances where car dealers qualified as "creditors" under the ECOA).

13

on inaccurate or arbitrary information in a credit report. The Court respectfully disagrees that the count should be dismissed.

Congress enacted the FCRA to address abuses in the consumer reporting industry. *See, e.g.*, S. Rep. No. 91-517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan). Congress found that credit agencies were too often reporting inaccurate information that was adversely affecting the ability of individuals to obtain employment. *See Dalton v. Capital Assoc. Indus., Inc.*, 257 F.3d 409, 414-15 (4th Cir. 2001) (discussing legislative history). With respect to the FCRA, Congress adopted a variety of measures designed to insure that agencies report accurate information.

Section 1681m of the FCRA requires that "[i]f any person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report, the person shall provide *oral*, written, or electronic notice of the adverse action to the consumer." 15 U.S.C. § 1681m(a)(1) (emphasis added). In other words, unlike the ECOA, the FCRA readily allows for oral notice of an adverse credit action. Section 1681m requires such notice—whether provided orally, in writing, or electronically—to include (i) the name, address and telephone number of the relevant consumer reporting agency that furnished a report in connection with the adverse action, (ii) a statement that the agency did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken, and (iii) information regarding the consumer's right to obtain a free copy of a consumer's report from the agency and to dispute the accuracy or completeness of any information in the consumer report. 15 U.S.C. § 1681m(a)(2)-(3).

14

Defendants correctly point out that, in the Amended Complaint, Plaintiffs allege that Mauro Chevrolet twice told Alvarado that he had been denied financing in his own name. (D.E. 27 ¶¶ 7, 12, and 13.) Nothing about that allegation is necessarily inconsistent with the idea that Mauro did not make all of the disclosures required by section 1681m(a). Given that whether Mauro Chevrolet provided such information is an open factual question, the Court declines to dismiss Count III. *Accord Rodriguez v. Ford*, No. 03 C 7727, 2004 WL 2958772, *8 (N.D. Ill. Nov. 18, 2004).

In addition, Mauro Chevrolet's contention that Count III should be dismissed because Plaintiff Alvarado failed to allege that he was denied financing due to inaccurate or arbitrary information in his credit report is without merit. Nothing in the statute suggests that the credit report must be based on inaccurate or arbitrary information to trigger the FCRA's notice provision. Instead, it appears that the FCRA's notice provision is triggered by any adverse action with respect to "*any* information contained in a consumer report." 15 U.S.C. §1681m(a) (emphasis added).

Although the issue is briefed in cursory fashion, Defendants Larson and Bosco appear to suggest that Count III should be dismissed because the purchase of the vehicle was between Mauro Chevrolet and Costa, and not with Plaintiff Alvarado. The identity of the purchaser of the vehicle is a factual determination that cannot be made on a motion to dismiss. Furthermore, it appears that the FCRA notice requirement applies when a "consumer" is the subject of an adverse action, not merely when the consumer purchases something. In any event, the Court does not pass definitively on such issues given the cursory treatment in the parties' briefs, and will not grant the motion to dismiss on such basis. The Defendants are free to raise this issue and

to thoroughly brief it, if they think it has merit, at other appropriate stages of the proceedings. For now, Defendants' motion to dismiss on such basis is denied.[8]

For all of these reasons, the Court denies the motions to dismiss Count III.

### D. Counts IV and V: Violation of Illinois Consumer Fraud Act Against Mauro Chevrolet, Larson, Bosco, and GMAC and Common Law Fraud in the Inducement Against Mauro Chevrolet, Larson, and Bosco

Counts IV and V allege violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Illinois Fraud Act"), 815 ILCS 505/1-12, and common law fraud in the inducement on the part of Defendants Mauro Chevrolet, Larson and Bosco. (D.E. 27 ¶¶ 84-97.) Count IV also alleges that GMAC is liable for this unfair and deceptive conduct under the Illinois Fraud Act as the holder of the Plaintiffs' consumer credit contract under the "FTC Holder Rule" and that "GMAC may have ratified the fraudulent conduct of Mauro Chevrolet." (*Id.* ¶¶ 98-99.) Defendants Mauro Chevrolet, Larson and Bosco contend that Counts IV and V should be dismissed because they are not pled with sufficient particularity. GMAC contends that Count IV should be dismissed on various grounds related to limitations on assignee liability. These contentions are addressed below.

#### 1. Particularity Analysis

To state a claim under the Illinois Fraud Act, a plaintiff must allege that (i) the defendant engaged in a deceptive act or practice, (ii) with the intent that the plaintiff rely on the deception, (iii) in the course of trade or commerce, and (iv) the deception was the proximate cause of the claimant's alleged injury. *See Neff v. Capital Acquisitions & Mgmt. Co.*, 238 F. Supp. 2d 986,

---

[8]     Defendants do not dispute that Mauro Chevrolet's alleged decision not to send Alvarado's credit application to any lender constitutes an "adverse action" under the FCRA. *See also Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 983 (7th Cir. 2004).

994 (N.D. Ill. 2002) (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. App. Ct. 1997)). A complaint alleging a violation of the Illinois Fraud Act must be pled with the same particularity and specificity as that required under common law fraud under Rule 9(b). *Murry v. Am. Mortg., Banc, Inc.*, No. 03 C 5811, 2004 WL 1474584, *6 (N.D. Ill. June 29, 2004) (citing *Gallagher Corp. v. Mass. Mut. Life Ins. Co.*, 940 F. Supp. 176, 180 (N.D. Ill. 1996)). Specifically, a plaintiff must state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Schiffels v. Kemper Fin. Svcs., Inc.*, 978 F.2d 344, 352 (7th Cir.1992) (quoting *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir.1992)).

A careful reading of the Amended Complaint reveals that Counts IV and V satisfy Rule 9(b)'s heightened pleading requirements. For example, in the Amended Complaint, Plaintiffs allege that certain Defendants falsely stated to Plaintiffs that they would be permitted to enter into a contract listing Alvarado as the buyer of the car, and listing Costa as the co-signor with respect to the car loan; that this statement led them to believe that the contract was approved for financing by GMAC; and that Defendants failed to return Plaintiffs' down payment after the credit application was rejected. (D.E. 27 ¶¶ 85-97.) In the Amended Complaint, Plaintiffs also allege that Defendants Mauro Chevrolet, Bosco, and Larson decided not to submit Alvarado's credit application to GMAC or any other lenders; that Bosco agreed to allow Costa to serve as Alvarado's co-signor; and that Larson confirmed that Costa would only be the co-signor and that all payments, subsequent paperwork and car title would be in Alvarado's name. (D.E. 27 ¶¶ 7, 15, 20, 25-27.) In addition, in paragraphs 6 through 66 of the Amended Complaint, which are incorporated by reference into Count IV, Plaintiffs specifically allege various circumstances

constituting fraud, including the specific roles played by each of the individual Defendants, as well as the timing and location of the alleged conduct.

Relying heavily on *Robinson v. Toyota Motor Credit Corp.*, 735 N.E. 2d 725 (Ill. App. Ct. 2000) ("*Robinson I*"), Defendant Mauro Chevrolet contends that, to sustain a claim based on unfair conduct under the Illinois Fraud Act, the plaintiff must allege that defendant's conduct (i) offended public policy, (ii) was so oppressive that the consumer has little alternative but to submit, *and* (iii) caused consumers substantial injury. Mauro Chevrolet argues that Count IV should be dismissed because it fails to include any allegations regarding oppressiveness or lack of meaningful choice with respect to the purchase of the vehicle. (D.E. 29 at 8-9.) This argument, however, disregards the Illinois Supreme Court's decision affirming *Robinson I*. *See Robinson v. Toyota Motor Credit*, 775 N.E. 2d 951, 961 (Ill. 2002) ("*Robinson II*").

In *Robinson II*, the Illinois Supreme Court discussed appropriate criteria for determining whether a course of conduct or act is unfair for purposes of the Illinois Fraud Act: "(i) whether the practice offends public policy, (ii) whether it is immoral, unethical, oppressive, or unscrupulous, (iii) whether it causes substantial injury to consumers." 775 N.E. 2d at 961 (citing *Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972)). The *Robinson II* court arguably broadened the second criteria from *Robinson I* (conduct "so oppressive that the consumer has little alternative but to submit") to include conduct that is "immoral, unethical, oppressive, or unscrupulous." *Compare Robinson II*, 775 N.E. 2d at 961 *with Robinson I*, 735 N.E.2d at 733. To be sure, this was not the focus of the Supreme Court's analysis, but the analysis suggested in *Robinson II* on prong two was more wide-ranging than that suggested by the Illinois Court of Appeals in *Robinson I*. This Court need not opine definitively

18

on that issue, however, because for present purposes, it is sufficient to note that the Illinois

Supreme Court in *Robinson II* specifically stated that "'all three criteria do not need to be

satisfied to support a finding of unfairness. A practice may be unfair because of the degree to

which it meets one of the criteria or because to a lesser extent it meets all three.'" *Id.* at 961

(citing *Chesire Mortg. Serv., Inc. v. Montes,* 612 A.2d 1130, 1143 (Conn. 1992)). Given this

open-ended review process, Defendants' suggestion that dismissal is appropriate because of

allegedly inadequate averments concerning certain criteria is respectfully rejected.

### 2.    Assignee Liability under Consumer Fraud Act

Plaintiffs also seek to hold GMAC liable under the Illinois Fraud Act. In making this

argument, Plaintiffs also reference the FTC Holder Notice, which is required under Federal Trade

Commission (the "FTC") regulation to appear in all consumer credit contracts. Plaintiffs argue

that GMAC is liable as the assignee of the contract between Costa and Mauro Chevrolet. GMAC

contends that (i) derivative liability is not permitted for purposes of the Illinois Fraud Act; (ii) an

assignee of a consumer contract, such as GMAC, cannot be liable under the Illinois Fraud Act for

a dealer's alleged deceptive acts and practices or misrepresentations where, as here, the

violations are not "apparent on the face" of the assigned contract; and (iii) Plaintiffs cannot

recover amounts already paid to an assignee, such as GMAC, where, as here, Plaintiffs cannot

allege they received "little or nothing of value." (D.E. 28 at 2-10.)

Perhaps because the legal issue is an arguable one, the parties have each briefed the

question of GMAC's putative liability under the Illinois Fraud Act as though it an open-and-shut

question. It is not, at least in this Court's view. The question is one on which people likely

could reasonably disagree, at least on the basis of authority cited by the parties and located by the

Court in its own supplemental research. At the end of the day, however, and as explained further below, the Court sides with substantial district court caselaw in this judicial district in finding that GMAC cannot be liable under the Illinois Fraud Act.

Plaintiffs' Illinois Fraud Act claims against GMAC are based on GMAC's status as an assignee, not on any alleged violations on the part of GMAC. (D.E. 36 at 12). Although the Seventh Circuit has not addressed this issue, substantial authority in this judicial district has held that derivative and assignee liability is not allowed under the Illinois Fraud Act under such circumstances. *See, e.g., Murry*, 2004 WL 1474584 at *7; *Brooks v. O'Connor Chevrolet, Inc.*, No. 02-2478, 2003 WL 22427795, *3 (N.D. Ill. Oct. 23, 2003); *Manufacturers & Traders Trust Co. v. Hughes*, No. 99 C 5849, 2003 WL 21780956, *3 (N.D. Ill. July 31, 2003); *Dowdy v. First Met. Mort. Co., et al.*, No. 01 C 7211, 2002 WL 745851, *3 (N.D. Ill. Jan. 29, 2002); *see also Jackson v. South Holland Dodge, Inc.*, 755 N.E.2d 462, 471 (Ill. 2001); *Zekman v. Direct Am. Marketers, Inc.*, 695 N.E.2d 853, 860 (Ill. 1998).

As stated, to prevail on a claim under the Illinois Fraud Act, a plaintiff must allege that (i) the defendant engaged in a deceptive act or practice, (ii) with the intent that the plaintiff rely on the deception, (iii) in the course of trade or commerce, and (iv) the deception was the proximate cause of the claimant's alleged injury. *See Neff v. Capital Acquisitions & Mgmt. Co.*, 238 F. Supp. 2d 986, 994 (N.D. Ill. 2002) (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. App. Ct. 1997)). The Illinois Supreme Court has emphasized, however, that liability under the Illinois Fraud Act is limited to defendants who have actually participated in the scheme to defraud the plaintiff. *See, e.g., Murry*, 2004 WL 1474584 at *7 (stating that the "*sine qua non* of an allegation of a violation of the [Illinois Fraud Act] . . is that the defendant actually

20

participated in the scheme to defraud the plaintiff) (citing *Jackson*, 755 N.E.2d at 471, and

*Zekman*, 695 N.E.2d at 859); *Brooks*, 2003 WL 22427795 at *3 ("Under Illinois law . . . in order

to have an action against an assignee, a plaintiff must allege and prove that the assignee's fraud is

active and direct") (citations omitted); *Hughes*, 2003 WL 21780956 at *3 ("Illinois law is

absolutely clear that . . . assignees of the allegedly fraudulent mortgage cannot be held liable

under the . . . [Illinois Fraud Act] from the assignor's alleged fraud") (internal quotation marks,

punctuation, and citation omitted); *Dowdy*, 2002 WL 745851 at *2 ("Illinois law is clear on the

point that only the perpetrator of the fraud, and not a subsequent assignee, can be liable for a

violation of the . . . [Illinois Fraud Act]") (citing *Zekman*, 695 N.E.2d at 859-60). Emphasizing

the requirement of actual participation, the Illinois Supreme Court has held that the Illinois Fraud

Act "does not even 'provide a cause of action against those who knowingly receive the benefits

from the person committing a violation of the Act.'" *Murry*, 2004 WL 1474584 at *7 (quoting

*Jackson*, 755 N.E.2d at 471)); *accord, e.g., Crowe v. Dodge*, No. 00 C 8131, 2001 WL 811655,

*11 (N.D.Ill. July 18, 2001) (Hibbler, J.); *Vance*, 1999 WL 731764 at *5. In order to have a

claim against the assignee, "plaintiffs would have to allege that 'the assignee['s] fraud is active

and direct.'" *Dowdy*, 2002 WL 745851 at *3 (quoting *Jackson*, 755 N.E.2d at 471)). Plaintiffs

make no such allegations here in connection with the extension of credit to Plaintiffs.

Plaintiffs also note that they are advancing their Illinois Fraud Act claim in conjunction

with the FTC Holder Notice language. The FTC Holder Notice must appear on consumer credit

contracts, and it provides that "'[a]ny holder of this consumer credit contract is subject to all

claims and defenses which the debtor could assert against the seller of goods or services obtained

pursuant hereto or with the proceeds hereof.'" *E.g., Jarvis v. South Oak Dodge, Inc.*, 773 N.E.2d

641, 645 (Ill. 2002) (quoting the FTC Holder Notice) (internal capitalization omitted). GMAC in turn cites caselaw, including the Illinois Supreme Court's recent decision in *Jarvis*, in which the Illinois Supreme Court, in applying the Illinois Fraud Act, notes "the FTC Holder Notice has been largely superceded by subsequent federal legislation, namely, section 1641(a) of TILA." *Id.*, 773 N.E.2d at 648.[9]

In this regard, Plaintiffs state that they are not alleging that GMAC knowingly received the benefits of Mauro's fraud, so their claim is not based on any participation in the fraud but rather is one based on GMAC's status as the purchaser of the retail installment contract. As a result, they suggest that the FTC Holder Notice will allow recovery. (D.E. 36 at 12.).

Although this Court thinks this FTC Holder Notice argument is at least a colorable one, it has been soundly rejected in cases in this district. For example, in *Dowdy*, Judge Holderman rejected the idea that a plaintiff seeking to invoke the Illinois Fraud Act could invoke assignee liability language from the Truth in Lending Act that is analogous to the FTC Holder Notice so as ground an Illinois Fraud Act claim. *Id.*, 2004 WL 745851 at *3. Instead, *Dowdy* stated:

> Illinois is absolutely clear on the point that Bankers and EMC, as assignees of the allegedly fraudulent mortgage, cannot he liable under the . . . [Illinois Fraud Act] for First Metropolitan's alleged fraud. The Illinois Supreme Court held in *Zekman v. Direct American Marketers, Inc.*, 695 N.E.2d 853 (1998), and recently reaffirmed in *Jackson v. South Holland Dodge, Inc.*, 755 N.E.2d 462 (2001), that the reach of the ICFA is limited to "conduct that defrauds or deceives consumers or others" and "does not provide a cause of action against those who knowingly receive benefits from the person committing the

---

[9]    As other courts have noted, the FTC Holder Notice has not been rendered completely meaningless by subsequent amendments and caselaw interpretations. For example, the notice "continues to fill a valuable role by confirming the right of buyers to withhold payment from sellers or assignees, if it becomes apparent that the car purchased is a lemon." *Jackson v. South Holland Dodge, Inc.*, 755 N.E.2d 462, 472 (Ill. 2001) (citing *Ellis v. General Motors Acceptance Corp.*, 160 F.3d 703, 709 (11th Cir. 1998). The case *sub judice* does not present such a scenario.

violation." *Zekman*, 695 N.E.2d at 85. In order to have a claim against assignees of an allegedly fraudulent mortgage, plaintiffs would have to allege that "the assignees' fraud is active and direct," *Jackson*, 755 N.E.2d at 471, which plaintiffs in this case do not allege. Although the mortgage at issue is subject to TILA, count II is a state law claim and this court must therefore apply the state law.

*Id.* Judge St. Eve applied *Dowdy* in summarily dispatching an Illinois Fraud Act claim advanced, as here, with reference to the FTC Holder Rule. Judge St. Eve held that "[u]nder Illinois law . . . to have an action against an assignee, a plaintiff must allege and prove that the assignee's fraud is active and direct." *Brooks v. O'Connor Chevrolet, Inc., No. 02-2478,* 2003 WL 22427795 at *3. Because the assignee was not actively involved in the alleged fraud, the claim was dismissed. In *Hughes*, Judge Gottschall similarly applied *Dowdy* and the Illinois Supreme Court caselaw cited in it to reject an Illinois Fraud Act claim concerning the assignee of a mortgage, where there was no active direct involvement in the alleged fraud by the assignee. *Id.*, 2003 WL 21780956 at *3; *see also Pulphus v. Sullivan*, No. 02 5794, 2003 WL 1964333, *21 (N.D. Ill. Apr. 28, 2003) (Plunkett, J.) (rejecting the argument that the Illinois Supreme Court's teaching in *Zekman*, *supra*, "has nothing to do with assignee liability," because "the *Zekman* court did not limit its discussion to one specific context. On the contrary the court framed the issue before it quite broadly . . . .").

In the face of this substantial number of contrary cases, Plaintiffs (whose counsel maintain a high volume practice in such cases in this district, and were counsel in at least one of the cases cited above) fail to cite a single opinion where the *Zekman*-based challenge to this type of claim has not prevailed. In the face of no supportive authority, this Court declines to break with the other cases cited on this point by GMAC.

In this case, Plaintiffs were given the opportunity to amend their complaint in part to

clarify the issue of whether they were asserting a direct claim for violation of the Illinois Fraud Act against GMAC or one based on derivative liability. (D.E. 25). Plaintiffs have not included any allegations of direct participation by GMAC in any fraudulent acts, which makes it clear that Plaintiffs are attempting to proceed, at least in part, on a theory of derivative liability. Under Illinois law as articulated in *Zekman*, *supra*, and as applied by caselaw in this district, that theory fails.

The Court also notes that even if the teachings of cases such as *Dowdy*, *Brooks*, and *Hughes* were misplaced, Plaintiffs' claim against GMAC would likely fail because substantial authority teaches that the FTC Holder Notice cannot be used affirmatively (*i.e.*, as something beyond a defense to another claim) in the circumstances of this case. Under the FTC Holder Notice, a plaintiff's ability to recover amounts already paid to an assignee such as GMAC is typically limited to the circumstance where the plaintiff has "received little or nothing of value from the seller." 40 Fed. Reg. at 53527 (1975). As the Illinois Supreme Court stated in *Jackson*, which was an Illinois Fraud Act case:

> The official commentary [to the Holder Rule] reads as follows:
>
>> This rule is directed at the preservation of consumer claims and defenses [which] means that a consumer can (1) defend a creditor's suit for payment of an obligation by raising a valid claim against the seller as a set-off, and (2) maintain an affirmative action against a creditor who has received payments for a return of monies paid on account. *The latter alternative will only be available where a seller's breach is so substantial that a court is persuaded that rescission and restitution are justified. The most typical example of such a case would involve non-delivery, where delivery was scheduled after the date payments to a creditor commenced.*

*Jackson*, 755 N.E.2d at 472 (quoting 40 Fed. Reg. 53,505, 53,524 (1975)) (emphasis added). In this regard, the FTC's official commentary on the Holder Rule further states:

24

> Consumers will not be in a position to obtain an affirmative recovery from a creditor, unless they have actually commenced payments and received little or nothing of value from the seller. In a case of non-delivery, total failure of performance, or the like, we believe that the consumer is entitled to a refund of monies paid on account.

40 Fed. Reg. at 53, 527 (1975). Caselaw in this district supports the view that substantial failure of performance on the contract is needed. *See, e.g.*, *Mount v. LaSalle Lake View Bank*, 926 F.Supp. 759, 763-64 (N.D. Ill. 1996) (collecting cases)

Plaintiffs challenge this position, and note that one portion of the FTC Guidelines states that "'[t]he creditor stands in the shoes of the seller.'" D.E. 36 at 3 (quoting 41 Fed. Reg. 20,022, 20,023 (1976)). Plaintiffs also, while acknowledging that "the case law in this district does trend the opposite way" (*i.e.*, against Plaintiffs' position), suggest that "the better reasoned position is the one set forth in *Jaramillo v. Gonzales*, 50 P.3d 554 (N.M. Ct. App. 2002)." (D.E. 36 at 10.) Although the Court need not pass definitively on the question, the Court would be strongly inclined to follow the majority (and perhaps uniform, given Plaintiffs' citation to the *Jaramillo* case) view in this district that in order to ground an affirmative recovery, conduct warranting rescission would be required. *Accord, e.g.*, *Mount*, 926 F.Supp. at 763-64. This view also appears to be the strong majority position nationwide. In this regard, in *Irby-Greene v. M.O.R., Inc.*, 79 F.Supp.2d 630 (E.D. Va. 2000), Judge Ellis undertook an extensive survey of federal and state caselaw in this area and explained that, "[i]n short, most courts have concluded that the primary purpose of the [FTC Holder] clause is to provide a defense to claims brought by the creditor; *any affirmative use of the clause has generally been limited to the rare situation when the seller's breach renders the transaction practically worthless to the consumer.*" *Id.*, 79 F.Supp.2d at 635-36 & nn. 19 and 20 (collecting cases; emphasis added); *accord, e.g.*, *Jackson*, 755 N.E.2d at 472; *Ford Motor Co. v. Morgan*, 536 N.E.2d 587, 590 (Mass. 1989) ("The FTC

did not intend that the rule would, as a matter of course, entitle a consumer to a full refund of monies paid on the account."). Here, there is no allegation that Plaintiffs were placed in a position where they suffered from a "total failure of performance," or from "non-delivery" of the vehicle, or from something that can be readily analogized to such a complete non-fulfillment of the contract by the vendor. *See* 40 Fed. Reg. at 53, 527 (1975). Nonetheless, Plaintiffs at least suggest that they could prove that rescission would be warranted—because the way the contract was structured did not allow Alvarado to develop a credit history. The Court need not resolve this issue, given the Court's holding above, but short of a showing of substantial non-performance of the type outlined above (the Court takes no position on whether not allowing the driver to develop a credit history can fairly be likened to non-delivery or total failure of performance, although Plaintiffs cite no authority to support the idea that it can be) dismissal would be warranted in any event.

In their brief, Plaintiffs also suggest that they may be able to sustain a viable Illinois Fraud Act claim based on a theory of ratification. This position is reflected in a tentative assertion in the Amended Complaint, which states that "GMAC may have ratified the fraudulent conduct of Mauro Chevrolet when, after being put on notice of this conduct, it continued to insist that Plaintiff Costa is responsible for the deficiency notice." (D.E. 27 ay 14.) Plaintiffs explain that GMAC's "post-assignment course of conduct may be construed as a ratification, a retroactive adoption of the contract that GMAC knew was fraudulently procured." (D.E. 36 at 13.) While further proceedings will be needed to see if the contract at issue was fraudulently procured, and discovery will be needed to see if GMAC "knew [the contract] was fraudulently procured," the current state of the pleadings do not allow for this theory to be assessed

26

conclusively as a matter of law. As a result, on this basis the Court will allow Count IV, the Illinois Fraud Act claim, to proceed to discovery as against GMAC. The Court notes, however, that it is well-settled in the caselaw of the Illinois Supreme Court and courts in this district, as discussed extensively above, that even knowing receipt of the proceeds of fraud by one not involved in the fraud is not actionable under the Illinois Fraud Act. Accordingly, if any ratification theory will ultimately be viable as against GMAC, it will need to comport with this teaching. *See Crowe,* 2001 WL 811655 at *11 (rejecting ratification theory of the plaintiff concerning car loan and defendant-assignee of the credit contract, and noting that defendant's non-responsiveness to a complaint letter by the plaintiff was an inadequate basis to ground liability).

E.     **Counts VI and VII: Violation of Article 9 of the Illinois Commercial Code - Wrongful Repossession and Conversion Against GMAC**

Count VI alleges that GMAC violated section 9-609 of the Illinois Commercial Code by repossessing the Chevrolet Cavalier when Plaintiffs' account was not in default. (D.E. 27 ¶ 114.) Specifically, in the Amended Complaint, Plaintiffs allege that their "account with GMAC was not in default at the time GMAC took possession of the Chevrolet Cavalier because Plaintiff Alvarado was instructed to make the payments at Mauro Chevrolet and did so diligently and timely." (*Id.* ¶ 112.) Count VII alleges common law conversion against GMAC based on such wrongful repossession. (D.E. ¶¶ 117-119.) GMAC contends that Counts VI and VII should be dismissed because, in the Amended Complaint, Plaintiffs admit that Mauro Chevrolet did not forward Alvarado's payments to GMAC in a timely fashion, and thus admit that there was a default on the GMAC loan. (D.E. 28 at 9-10.) The Court respectfully disagrees, at least at this stage of the proceedings.

Section 9-609 of the Illinois Commercial Code provides that "[a]fter default, a secured party: (1) may take possession of the collateral." 810 ILCS 5/9-609(a)(1). The parties dispute whether a default occurred on the loan to GMAC. The official comment to section 9-601 of the Illinois Commercial Code—which describes the rights of a secured party after default (including right to repossession under section 9-609)—states that:

> Article [9] leaves to the agreement of the parties the circumstances giving rise to a default. [. . . .] [I]t continues to leave to the parties' agreement, as supplemented by law other than this Article, the determination whether default has occurred or has been waived.

819 ILCS 5/9-601, Uniform Commercial Code Comment 3.[10] In other words, the language of the relevant contract (and other relevant facts, if any) determines the meaning of 'default' for purposes of this provision of Article 9. Such information is not presently available, as the Amended Complaint does not contain the relevant contract(s) and the parties are otherwise in dispute about the relevant background facts. Such factual determinations are not properly decided on a motion to dismiss. Accordingly, the Court denies the motion to dismiss Counts VI and VII.[11]

---

[10]    It appears as though Illinois, in enacting the Illinois Commercial Code, has adopted or endorsed in at least some fashion the Official Commentary from corresponding sections of the Uniform Commercial Code. (For example, the Commentary from the U.C.C. is enrolled in with the sections of the Illinois Commercial Code when the Illinois Commercial Code is accessed on-line.) Accordingly, the U.C.C. comment cited above appears to be relevant in applying Article 9 of the Illinois Commercial Code.

[11]    At least as briefed, the motion to dismiss the conversion count essentially stands or falls with the motion on the Article 9 count. Accordingly, the motion to dismiss the conversion count is denied for the reasons stated above.

**F.     The Status of Larson and Bosco as Employees of Mauro Chevrolet**

Larson and Bosco contend that they should be dismissed from the Amended Complaint because, as mere employees, they should not be held liable for Mauro Chevrolet's obligations. (D.E. 30 ¶¶ 2-6.) Relying on alter ego/veil piercing cases, they argue that shareholders, directors and officers generally are not liable for a corporation's obligations. (*Id.* ¶¶ 4-5 (citing *In re Rehabilitation of Centaur Ins. Co.*, 632 N.E.2d 1015 (Ill. 1994), and *In re Estate of Wallen*, 633 N.E.2d 1350 (Ill. App. Ct. 1994)).[12]

As with the issue concerning Alvarado's status as a non-contracting party and Count III, this issue has been briefed in only cursory fashion. Accordingly, the Court declines to dismiss any counts against Defendants Larson and Bosco on such basis. Neither of the two alter ego/veil piercing cases address the issue presented in this case in any meaningful fashion—that is, whether an employee can be held liable under the CROA, the FCRA, and the Illinois Fraud Act, respectively, based on the employee's acts or omissions during the course of his employment. If Larson or Bosco believe this is a serious basis for potential dismissal, they should move with more fulsome legal citations at a future appropriate stage of the proceedings. For now, however, the motion to dismiss on any such basis is respectfully denied.

---

[12]     "The doctrine of alter ego fastens liability on the individual who uses a corporation merely as an instrumentality to conduct his or her own personal business, and such liability arises from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation. The corporate form may be disregarded only where equity requires the action to assist a third party." W. Fletcher, *Private Corporations* § 41.10, at 615 (rev. ed. 1990).

## IV.  Conclusion

For the reasons stated above, the motions to dismiss are denied.

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Date:  7-18-05